**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Robin Gana McGhee, | ) | Case No.: 05-41992-BGC-13 |
| | ) | |
| Debtor. | ) | |
| | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| Robin Gana McGhee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | AP No.: 05-40191-BGC-13 |
| | ) | |
| Jim Pritchett, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| Robin Gana McGhee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | AP No.: 05-40228-BGC-13 |
| | ) | |
| Jim Pritchett, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum Opinion for**
**A. P. No. 05-40191 and A. P. No. 05-40228**

**I. Background**

There are two complaints before the Court. One was filed June 20, 2005, as Adversary Proceeding No. 05-40191. The other was filed on September 15, 2005, as Adversary Proceeding No. 05-40228. Both were filed pursuant to section 362(h) of the

Bankruptcy Code, 11 U.S.C. § 362(h), and both seek damages for alleged willful violations of the automatic stay.

After notice, a single trial was held on both complaints on December 8, 2005. Appearing were: the plaintiff, Ms. Robin McGhee; her attorney, Mr. Frank LaBudde; the defendant, Mr. James Pritchett; the Chapter 13 trustee, Ms. Linda Gore; Ms. Summer Boling, a witness; and Ms. Misty Gordon, a witness. Mr. Pritchett represented himself.

All matters were submitted on the testimony, exhibits admitted into evidence, the record in both proceedings, and the record in the main bankruptcy case.

## II. Findings of Fact

### A. Prologue

The debtor owned two automobiles when she filed her Chapter 13 case on June 9, 2005. Those were a 1996 Nissan 200SX and a 1996 Ford Crown Victoria. The Nissan is the subject of Adversary Proceeding No. 05-40191. The Ford is the subject of Adversary Proceeding No. 05-40228.

Ms. McGhee purchased both automobiles from the defendant, Mr. James Pritchett, who does business as "101 Express Auto Sales." Each separate purchase was an installment purchase. In each, Ms. McGhee made a down payment and agreed to pay the balance in weekly installments. Mr. Pritchett retained the certificate of title in each transaction pending payment.

### 1. The Nissan - A. P. No. 05-40191

Ms. McGhee purchased the Nissan on January 11, 2005. The purchase price was $3,415.61. She paid $600 down and agreed, in a writing entitled "Bill of Sale - Used Cars," to pay the remainder of the purchase price, without interest, in successive weekly installments. Debtor's Exhibit B. The first three installments were $100 each. The remaining installments were $50 each. The first installment was due on January 18, 2005.

### 2. The Ford - A. P. No. 05-40228

Ms. McGhee purchased the Ford on December 9, 2004. The purchase price was also $3,415.61. She paid $500 down and agreed, in a writing entitled "Bill of Sale - Used Cars," to pay the remainder of the purchase price, without interest, in successive weekly installments. Debtor's Exhibit C. The first four installments were $100 each. The remaining installments were $50 each. The first installment was due on December 16, 2004.

2

## B. Evidence Specifically Relating to the Nissan

Ms. McGhee filed the pending bankruptcy case on June 9, 2005.

## 1. Ms. McGhee's Testimony

Between January 11, 2005, and June 9, 2005, $1,250 became due on Ms. McGhee's Nissan debt to Mr. Pritchett. During that same period, Ms. McGhee payed a total of $800 on that debt. Debtor's Exhibit B. Because Ms. McGhee failed to make all payments, Mr. Pritchett had the car repossessed. While the parties agree that the repossession occurred in June 2005, and sometime prior to June 20, (the date Ms. McGhee filed the adversary proceeding relating to the Nissan), they disagree about the specific date of the repossession.

Ms. McGhee testified that after she filed her bankruptcy case, but before the Nissan was repossessed, she received a telephone call from Mr. Pritchett's secretary. His secretary identified herself as "Misty," and called Ms. McGhee about the failure to make all of the Nissan payments. Ms. McGhee testified that she told Misty that she had filed a Chapter 13 case; asked Misty to contact her attorney; and gave Misty her bankruptcy case number. Ms. McGhee specifically denied that she ever told Mr. Pritchett, after June 9, 2005, that she had not filed a bankruptcy case.[1]

Ms. McGhee testified that the Nissan was repossessed on June 14, 2005. She testified that the personal items in the car when the car was repossessed were a compact disk player, twelve speakers, a twelve hundred watt amplifier, and a number of compact disks. According to Ms. McGhee, all of those items, except for the amplifier, for which she paid $189.00 new, were still in the car when Mr. Pritchett returned it to her on September 10, 2005.

Ms. McGhee claims that, as a result of the repossession of the Nissan, she had difficulty traveling to work. She contends that problem caused her to miss about 15 days of work during the three month period she was without the Nissan. Monetarily, that time equals about $714.00 in wages, an amount based on Ms. McGhee's hourly wage of $6.00 an hour.

Ms McGhee also contends that because she continued to miss work because of her transportation problems, she was ultimately fired. She testified, "They laid me off because they said I did not have dependable transportation, so they laid me off." Transcript at 11.

---

[1] Mr. Pritchett contends that prior to June 22, 2005, no one told him that Ms. McGhee filed bankruptcy and he specifically testified that both Ms. McGhee and her attorney's secretary, told him Ms. McGhee had not filed.

Ms. McGhee testified that the Nissan was in good mechanical condition and operating well when it was repossessed. In contrast, she testified that three days after Mr. Pritchett returned the car to her, she had a transmission problem where the vehicle would not operate in reverse. That problem has not been repaired, but Ms. McGhee has continued to operate the car, at least on occasions when she will not be required to drive it in reverse. She testified, "It is an inconvenience." Transcript at 11. She explained that she could not drive it to work because she would have to park it in a manner that would require her to back out of a parking space. But she could drive it to the bankruptcy court because she could park on the street in such a way that she could drive forward when she left. Interestingly, Ms. McGhee testified that her father was a mechanic.

Ms. McGhee has four children. She testified that because she was without the Nissan and because it does not operate properly now, she has had difficulty taking her three-year-old daughter to day care. In addition, there is no school bus stop where she and her children live. She either has to walk her other three children to school, or walk them two blocks from home to meet the bus, or have someone else to take them to school.

Ms. McGhee testified that she had insurance on the Nissan before it was repossessed and at the time it was repossessed. However, on cross-examination, she testified that she cannot remember with whom the car was insured during that pre-repossession period.

As a condition of Mr. Pritchett returning the car while these proceedings were pending, this Court entered an order on September 9, 2005, directing Ms. McGhee to obtain insurance. She testified that she did in September 2005. Mr. Pritchett returned the car to her pursuant to this Court's order. But apparently Ms. McGhee did not, at that time obtain the insurance she promised to get. She explained that when she discovered the problem with the car's transmission, she parked the Nissan in her yard and cancelled the check she wrote to obtain the new insurance. Consequently, the insurance policy lapsed. About a week later, on the advice of her attorney, she once again secured insurance on the vehicle and has maintained it since.

Two observations about casualty insurance on the Nissan are apparent from Ms. McGhee's testimony. One, the fact that she obtained insurance a second time pursuant to this Court's September 9, 2005, order, indicates that the Nissan was, as has been suggested by Mr. Pritchett, not insured during some, if not all, of the period of time that it was in his possession following its repossession. Hence his stated reluctance to return it to her without an order requiring her to obtain insurance. Two, it is unreasonable to believe that Ms. McGhee was unable to offer any description of whom she paid insurance premiums during the six-month period preceding the repossession. That, in turn, bolster's Mr. Pritchett's claim that Ms. McGhee did not have casualty insurance on the car during that period.

4

## 2. Ms. Boling's Testimony

Ms. Summer Boling was employed by the debtor's attorney when Ms. McGhee filed her Chapter 13 petition. Ms. Boling testified that she telephoned Mr. Pritchett's business in the afternoon of June 9, 2005, after the petition was filed. She was informed that he was not in and discontinued the call. She called again on June 10, the next day, and talked to Mr. Pritchett. She told him that Ms. McGhee had filed bankruptcy and provided him with her case number. She said that she called Mr. Pritchett again after Ms. McGhee informed her that the Nissan had been repossessed. At that time, she reminded him that Ms. McGhee was in bankruptcy and told him that he should return the Nissan. She did not identify the date of the second call. According to her testimony, those conversations were her only contact with Mr. Pritchett.

On cross examination by Mr. Pritchett, she specifically denied that she waited until after the Nissan was repossessed to tell Mr. Pritchett about Ms. McGhee's bankruptcy filing.

## 3. Mr. Pritchett's Testimony

Mr. Pritchett testified on direct examination that the Nissan was repossessed on June 8, 2005. He testified that Ms. McGhee came to his office the next day, June 9, and told him that she had not filed bankruptcy, and that she did not intend to file bankruptcy. He testified that she also told him that she wanted to make arrangements to have the Nissan returned. He testified that Ms. McGhee called her attorney's office in his presence. During that time he spoke with the attorney's secretary, who also assured him that Ms. McGhee had not filed bankruptcy and asked him to, "make arrangements to return the vehicle." Transcript at 37. He testified that he received a letter from Ms. McGhee's attorney on June 22, 2005, informing him that Ms. McGhee had filed a Chapter 13 petition, and that she had filed an adversary proceeding (A.P. No. 05-40191) against him. He said that letter represented the first notice, verbal, written or otherwise, he received that Ms. McGhee was in bankruptcy. He testified that prior to receipt of that letter, he did not know that Ms. McGhee had filed a bankruptcy case.

On cross examination, Mr. Pritchett testified that he does not remember the date the Nissan was repossessed. He stated, "I'm not for sure what day it was, Mr. LaBudde." Transcript at 30-31. But he continued to insist that he did not speak to anyone from Ms. McGhee's attorney's office until after the car was repossessed, regardless of when that occurred. He stated, "I know the next day, whatever day it was, the next day is when I got a call from, I guess, your secretary wanting to make arrangements for me to return the vehicle." Transcript at 30.

According to Mr. Pritchett, that one telephone call represented the only time he spoke with anyone from Ms. McGhee's attorney's office on the telephone. He said, however, that Ms. McGhee called him numerous times from her place of employment

5

before June 22 to discuss how she could recover the Nissan. Mr. Pritchett testified that during each of those conversations, Ms. McGhee assured him that she had not filed bankruptcy.

Mr. Pritchett does not deny that he was provided official notice from the bankruptcy court about Ms. McGhee's bankruptcy filing. But, he did not recall having received that notice, and he insists that the first notification that he received about Ms. McGhee having filed bankruptcy came on June 22 in the form of the letter sent to him by Ms. McGhee's attorney.

The Court's records in Ms. McGhee's Chapter 13 case reflect that notice of the case was mailed to Mr. Pritchett on June 11, 2005. Of course, there is no evidence of when the notice arrived at Mr. Pritchett's. Consequently, there is no basis to conclude the notice arrived before June 22.

Mr. Pritchett denied that either the debtor or anyone from her attorney's office ever demanded that he return the Nissan. He admitted, however, that prior to June 22 both the debtor and Ms. Boling verbally requested him to return the car. He stated that he did not know that his refusal to honor those requests might constitute a stay violation. He explained that he did not know that Ms. McGhee had filed her bankruptcy, and that he was specifically advised by both the debtor and Ms. Boling that Ms. McGhee was not in bankruptcy.

In addition, Mr. Pritchett did not think that the intent of the letter he received from Ms. McGhee's attorney on June 22, 2005, which is not in evidence, was to demand that he return the vehicle forthwith to Ms. McGhee. He believed that the letter was to advise him that Ms. McGhee had filed a bankruptcy petition and that an adversary proceeding had been filed against him where any disputes regarding his repossession and continued retention of the car would be decided by this Court. He testified:

> Q. You did receive a letter on June 22 from my office?
> A. Yes, sir, I did.
> Q. That letter was to advise you that we wanted the Nissan automobile returned?
> A. No, sir, I think that letter advised me that she had filed Chapter 13 and that was the adversary that you filed against me.
> Q. An adversary proceeding was filed against you on June 20, 2005. Is that your understanding?
> A. June 22, I believe, wasn't it?
> Q. So June 22, then, by your recollection an adversary proceeding was filed against you, the one that we are here on today?
> A. Yes, sir.
> Q. Did you not interpret that adversary proceeding as a request to return the Nissan automobile to Ms. McGhee?
> A. No, sir.

6

Q.    What did you think it was about?

A.    Well, the way I interpreted it, it was to come to court and let the judge decide. At that time, at that same time or shortly thereafter I had received a letter from a bankruptcy trustee. It was a copy of a motion that she had filed with the judge to have the case dismissed for nonpayment.

Q.    So your hope was that her case would be dismissed?

A.    I wasn't hoping anything, Mr. LaBudde. I didn't know what to do. You know, I had her telling me she wasn't filing bankruptcy. I had you telling me she was. I had a letter from the bankruptcy trustee asking the judge to dismiss the case. I didn't know what to do.

....

Q.    You didn't return the car when you were asked to; did you?

A.    I was not asked to, sir, except by the judge here and, when he asked me to return the car, I did so.

....

MR. PRITCHETT:    Just to say, Judge, you know, like I stated before, I had Ms. McGhee telling me she was not filing bankruptcy. I had Mr. LaBudde's office telling me that it was not filed. I had the bankruptcy trustee sent me a copy of a thing that she had filed with you asking you to dismiss the case for nonpayment. There was no insurance on the car. I wasn't about to return the car to Mr. LaBudde or Ms. McGhee or anybody as far as that goes until they at least got insurance, you know. And then at one point in time I just made up my mind that I was going to let a judge decide and that's exactly what I did, sir.

Transcript at 38-40; 41; 42.

        Mr. Pritchett testified that after the Nissan was repossessed it remained parked on a secure lot until Ms. McGhee came for it. He said that during the time it was parked on that lot it was not driven, or even cranked, that no one entered the car other than him, and that the mileage shown on the car's odometer when Ms. McGhee retrieved it was the same as it was when the car was delivered to his lot after being repossessed.

        He testified that when Ms. McGhee came to retrieve the car, she inspected the contents of the trunk, which included the stereo speakers and the amplifier, and told him that, "everything was fine." Transcript at 27. According to Mr. Pritchett, after inspecting the car, Ms. McGhee retrieved her husband's driver's license from it and

7

gave it to her husband, who had apparently accompanied her to the lot. She told Mr. Pritchett that the amplifier belonged to her husband.

Mr. Pritchett testified that one reason he was unwilling to return the Nissan to Ms. McGhee without first obtaining some direction from the bankruptcy court was because the vehicle was not insured. He said that he had asked Ms. McGhee on numerous occasions to obtain casualty insurance on the vehicle, but that she had continuously put him off, maintaining that she could not afford to keep the car insured. He said that to his knowledge, the only time the car was insured was after the September 7, 2005, hearing held in this proceeding, when the Court directed Ms. McGhee to obtain insurance on the Nissan as a condition for the return of the car. According to Mr. Pritchett, Ms. McGhee retained that insurance only long enough to recover her car, then she cancelled the insurance.[2]

Mr. Pritchett claimed that his contract with Ms. McGhee required her to maintain casualty insurance on the Nissan. However, at the hearing he did not produce any document which contained that requirement. The "Bill of Sale - Used Cars," which is attached to the Nissan proof of claim he filed on July 21, 2005, (admitted into evidence as Debtor's Exhibit B), does not contain any reference to insurance. It contains basic payment terms only. Moreover, it does not contain any reference to any other document. Mr. Pritchett was not asked, and did not say, whether that document represented the sole and entire written contract between Ms. McGhee and him relating to the Nissan.

Mr. Pritchett denied that he filed any proofs of claims in Ms. McGhee's bankruptcy case even though he clearly filed two proofs of claims. One relates to the transaction involving the purchase and sale of the Nissan. Another relates to the transaction involving the purchase and sale of the Ford. However, when pressed on the matter by Ms. McGhee's attorney, he admitted having his secretary prepare those, and that he did sign them.

Also attached to the proofs of claims are handwritten ledgers, ostensibly prepared either by Mr. Pritchett or someone on his behalf. The ledger attached to the proof of claim for the amount owed on the Nissan shows payments made and missed by Ms. McGhee from January 11, 2005, the date she executed the installment sales agreement, and June 7, 2005. The ledger also reflects the addition of other charges to Ms. McGhee's account, including $70.96 for repairs purportedly performed by Mr. Pritchett on March 30, 2005; $275.00 in cumulative "late fees" charged at $25 each time Ms. McGhee failed to deliver her weekly payments on time; and a $175.00 "repo fee" imposed on June 4, 2005.

---

[2] As explained above, Ms. McGhee stopped payment on the check she gave to pay for the insurance required by this Court.

Mr. Pritchett did not produce any document which authorized him to charge for post-sale repairs on the vehicle or to add such charges to the amount of the debt secured by the vehicle.

Similarly, Mr. Pritchett did not produce any document that authorized him to charge late fees of any sort. And the fees he did charge Ms. McGhee, which equaled one-half of her weekly payment, are particularly disturbing for a number of reasons. First, the imposition of unconscionably large late fees, in the absence of any contractual or statutory authority to impose them, must be considered wrong. Therefore, any representation by Mr. Pritchett to Ms. McGhee that he was entitled to any such fees, or that her balance at any given time was accurate despite the addition of those illegal fees, was incorrect.

Second, Mr. Pritchett testified specifically that he was not in the practice of charging Ms. McGhee late fees. He testified:

> And I even offered, you know, when she told me that she had not filed bankruptcy, I told her, I said, "Ms. McGhee, we will stop it right here, no late fees, which I don't charge late fees anyway but we will just start your payments at fifty dollars a week all over again."

Transcript at 29. That testimony was, of course, at best misleading, given the clear indication to the contrary on the ledgers attached to his proof of claim.

Third, a late fee, even if it had been authorized in some contract executed by Ms. McGhee, which equals one-half of the weekly payment is, "entirely disproportionate to the measure of liability which the law regards as compensatory...," and must, consequently, be considered an unenforceable penalty. Abb's Moving Service, Inc. v. Wooldridge, 612 So.2d 449, 452 (Ala. 1993)(quoting Milton Construction Co. v. State Highway Department, 568 So.2d 784, 789-90 (Ala. 1990)(quoting Williston on Contracts, 682 (3d ed. 1961).

And fourth, the unauthorized imposition of such exorbitant fees while Ms. McGhee was struggling to pay for the Nissan suggests an intent on Mr. Pritchett's part to frustrate and discourage her efforts by unjustifiably adding illegal additions to what she was already required to pay under her contract.

The total amount claimed by Mr. Pritchett in his proof of claim relating to the transaction involving the purchase and sale of the Nissan is $2,536.57. At trial, he testified that the correct amount of his claim for the Nissan is $2,043.05. He did not explain how he arrived at the reduced figure or why it is different from what he put on his proof of claim. However, the reduction appears to have had the practical effect of removing the offending add-on charges, including the late fees and the repossession fee, from the claimed amount.

9

### C. Evidence Specifically Relating to the Ford

Ms. McGhee filed the pending bankruptcy case on June 9, 2005.

### 1. Ms McGhee's Testimony

On direct examination, Ms. McGhee testified that, after the Nissan was repossessed, she was advised by Ms. Boling in her attorney's office that Mr. Pritchett might attempt to repossess the Ford, and that she should hide the Ford to guard against that possibility. A couple of days after Mr. Pritchett repossessed the Nissan, Ms. McGhee gave the Ford to her brother, Mr. Claudie Thompson, for safekeeping. Mr. Thompson lives in Fayette, Alabama, a different county from where she lives. She testified:

> After he repo'd the Nissan, I called the office and I spoke with his secretary and Summer told me that it would be good that if I hid the Crown Victoria because, if he repossessed the Nissan, he would come back for the Crown Victoria looking for it. So that's when I called my brother and he told me I could come and drop the car off down there and they would keep it until this matter was settled.

Transcript at 51.

Ms. McGhee testified that the Ford remained parked in her brother's yard until sometime in August 2005, just before the school year was to begin. No one operated the vehicle during that period. Ms. McGhee explained that at that time, she asked her brother to return the Ford to her. He complied by driving the car to her home. According to Ms. McGhee, after he arrived, he attempted to drive the car to her father's business. She testified that her brother told her that on his way there, he was hailed on the road by Mr. Pritchett, who, along with another man, were riding in another Ford Crown Victoria. She testified that her brother told her that when he stopped the car, Mr. Pritchett told him that the police were looking for the Ford, and that he would be in a lot of trouble if he did not relinquish possession of it.

Ms. McGhee also testified that her brother also told her: (1) he asked Mr. Pritchett if he could continue in the car to his father's business and release it there; (2) Mr. Pritchett agreed to follow him and take possession of the car there; (3) Mr. Pritchett followed him to her father's business; and (4) at his father's business Mr. Pritchett took possession of the Ford after her brother vacated it. She testified that those events occurred on or about August 9, 2005. Finally she testified that the Ford was insured when Mr. Pritchett took possession of it.

Ms. McGhee said that she wants to recover the Ford and to keep it in addition to the Nissan, because of the Nissan's mechanical problem. That is understandable. But she did not explain why she would need the Ford once the Nissan was repaired, or vice

versa, since she can drive only one at a time. This is especially important because of the additional expenses, such as insurance and maintenance, of owning two vehicles instead of one.

Several important observations are apparent from Ms. McGhee's direct examination testimony. First, the Court notes that Ms. Boling testified earlier in the trial and could have easily been recalled to explain why Ms. McGhee did not use the Ford for transportation after the Nissan was repossessed. But she was not. And more importantly, the Court does not believe that either the debtor's attorney, or anyone working for him, would advise Ms. McGhee to hide her second car. And, as a practical matter, after the Nissan was repossessed, the Ford was Ms. McGhee's, and her children's, only means of ready transportation.

Second, it is impossible for Ms. McGhee to know whether or not the Ford was operated while in her brother's possession. And her rendition of what her brother told her about the Ford is hearsay, which, had Mr. Pritchett been represented by an attorney, would have no doubt been met by a strenuous objection. Moreover, Ms. McGhee could have called her brother as a witness to testify as to his own personal knowledge about the vehicle. She did not. She could have called her father as a witness to support, in part, what she said her brother told her, i.e., that he relinquished possession of the car at her father's place of business. She did not.

Third, Ms. McGhee frankly admitted that her brother may not have accurately or truthfully relate the events surrounding Mr. Pritchett's obtaining possession of the Ford. She testified:

> Q.    Okay. And you are testifying that I came and that I repossessed this Ford Crown Vic, Ms. McGhee?
>
> A.    Your Honor, all I can say is that's what was told to me. Like I said, what was said between him and my brother, **I can't say who was lying and who's not lying**. All I know is I did not sell the vehicle. I can't say if his part of the story is true or if my brother's side of the story is true. All I can say is I know I didn't sell the vehicle, so I can't say which one of them are lying, and I am not going to sit here and say, well, he was lying or my brother was lying. So I can't just sit here and testify to something that I don't know.

Transcript at 59 (emphasis added).

In short, given the inherent unreliability of Ms. McGhee's second hand rendition of what her brother told her about the Ford, the Court cannot rely on that testimony.

On cross-examination, Ms. McGhee testified that prior to giving the Ford to her brother for safekeeping, the Ford had an expired license plate. She said that her

11

brother later told her that <u>he had obtained</u> a temporary tag for the car <u>until she could obtain updated "tag stickers" for her license plate</u>.  She testified, "So he did tell me that he got a temp tag for the car until I sent the tag stickers for the car."  Transcript at 56. She said that she eventually obtained the updated "tag stickers" for the license plate and sent them to her brother about two weeks prior to his returning the Ford to her. But, enigmatically, she then revised her testimony to say that her brother told her that <u>he was going to obtain</u> a temporary license plate <u>so that he could drive the car back to her</u>, but that she advised him not to get a temporary license plate because she was going to send him the updated "tag stickers." She testified that she did not even know that her brother had obtained the temporary license plate until Mr. Pritchett obtained possession of the car.  She stated:

> He did tell me that he tried to get a temp tag for the car to get the car back up here.  So I told him not to get the temp tag, said I was going to send the sticker, but I didn't have the money to get the stickers at the time because the stickers was seventy-six dollars.  So when I did get the stickers, I sent it to him.  I never knew about the temp tag until all of this was going on.

Transcript at 56.

Ms. McGhee testified that she has never seen the temporary license plate, and that when her brother arrived from Fayette with the car, her original license plate was still on the Ford, along with the undated "tag stickers" she had sent him.  She testified, "But when my brother brought my car back, my tag plates was on my car and the sticker that I had sent them was on the back of the car."  Transcript, page 57.

Ms. McGhee testified that she did not sell the Ford to her brother, as Mr. Pritchett contends.  She said that subsequent to Mr. Pritchett obtaining possession of the car, her brother had a telephone conversation with him, which, unbeknownst to Mr. Pritchett, Ms. McGhee was secretly monitoring.  Ms. McGhee said that, in that conversation, her brother told Mr. Pritchett that she had not sold him the car, but that he had obtained a temporary tag for it.  Ms. McGhee testified that in response, apparently quoting Mr. Pritchett, that Mr. Pritchett called her brother a liar, and added, "if I ever see you in my face, I am going to beat your black monkey ass," and, again apparently quoting Mr. Pritchett, "that goes for her lawyer, Mr. LaBudde, too, because I don't like his ass.  I will knock him down to the ground, too."  Transcript at 58.  She added, "That is coming from his mouth.  Those was his words...."  <u>Id</u>.

## 2.  Mr. Pritchett's Testimony

Mr. Pritchett testified that his secretary Ms. Misty Gordon received a telephone call about the Ford from a man named Claudie Thompson, Jr. from Fayette, Alabama. Mr. Pritchett represented that Ms. Gordon told him, that Mr. Thompson told her, that Mr. Thompson found a contract between Mr. Pritchett and Ms. McGhee in the glove

12

compartment of the Ford, and that Mr. Thompson asked Ms. McGhee whether she owed any money on the car. Ms. Gordon told Mr. Pritchett that she told Mr. Thompson: (1) that Ms. McGhee had financed her purchase of the car with Mr. Pritchett; (2) that there was indeed a balance outstanding on the car; and (3) that the car was involved in a bankruptcy case. Ms. Gordon told Mr. Pritchett that Mr. Thompson told her that Ms. McGhee had sold the car to him.

According to Mr. Pritchett, Mr. Thompson later delivered the Ford to Mr. Pritchett's business, got out of the car, and gave the keys to Mr. Pritchett. Mr. Pritchett testified that, at that moment, Mr. Thompson told him that Ms. McGhee had sold him the car and Mr. Thompson showed Mr. Pritchett a temporary license plate he had obtained in Fayette County, Alabama.

A photocopy of that temporary license was admitted into evidence as Defendant's Exhibit 1. The document is entitled "Alabama Twenty Day Temporary Tag." It reflects that it was issued for the Ford automobile involved in this proceeding and was issued to Claudie Thompson, Jr., by William Oswalt, Judge of Probate of Fayette County, Alabama. The temporary plate bears the license plate number A667802 and has an expiration date of August 16, 2005.

Mr. Pritchett testified that, based on his professional experience, someone cannot obtain a temporary license plate without a bill of sale. He said that he also had a telephone conversation with the court clerk in Fayette County who issued the temporary license plate. That individual told Mr. Pritchett that it is not possible for someone to obtain a temporary license plate without a bill of sale.

The ledger attached to Mr. Pritchett's proof of claim for the amount owed on the Ford shows payments made and missed by Ms. McGhee for December 9, 2004, the date she executed the installment sales agreement, and for June 9, 2005. Debtor's Exhibit C. The ledger also reflects additional charges to Ms. McGhee's account. Those include $77.44 for repairs purportedly performed by Mr. Pritchett on April 26, 2005, and **"late fees"** of **$475.00**, which **accumulated at $25 each time Ms. McGhee failed to deliver her weekly payments on time**. Once again, Mr. Pritchett did not produce any documentation that authorized him to charge for post-sale repairs on the vehicle or that authorized him to charge late fees of any sort.[3]

In addition, Mr. Pritchett distinctly testified that he was not in the practice of charging Ms. McGhee late fees. That of course must be incorrect given the clear indication to the contrary on the ledgers attached to his proof of claim. Furthermore, even if late fees had per se been authorized in some contract executed by Ms.

---

[3] As explained before, the imposition of unconscionable late fees by Mr. Pritchett on Ms. McGhee, in the absence of any contractual or statutory authority to impose the same, was wrong.

McGhee, the exorbitant late fees Mr. Pritchett charged may very well constitute an unenforceable penalty under Alabama law. And finally, the unauthorized imposition of such exorbitant fees suggests an intent on Mr. Pritchett's part to undermine and discourage Ms. McGhee efforts to perform her contract by substantially adding to the amount she was required to pay through that contract. And that appears to be exactly what happened here.

Mr. Pritchett's ledger reflects that Ms. McGhee made payments totaling $1,400 on the Ford prior to filing bankruptcy. Only $1,450 in payments were due to have been paid by her during the same period of time. However, by adding $475 in late fees to her account, Mr. Pritchett was able to show her in default by $525 as of the date that she filed her bankruptcy petition, even though she was actually only $50.00 behind in her payments. But, the issue of the appropriateness of the late fees, as well as Mr. Pritchett's actions in imposing those fees, is not before the Court, except to the extent that the legality, and hence the allowability of those fees, impacts the calculation of his claim. And based on the evidence presented, it must be concluded that those fees are improper and may not, therefore, be allowed as part of Mr. Pritchett's claim in this case.

The total amount claimed by Mr. Pritchett in his proof of claim relating to the transaction involving the purchase and sale of the Ford is $2,093.05. At trial, however, he testified that the correct amount of the claim is $1,865.00 without late fees and $2,268.05 with late fees. He did not explain how he arrived at those figures or why they differ from the amount he included in his proof of claim, an amount that is, at least, supported by his ledger.

The claim reflects a balance due on the Ford, after Ms. McGhee made her down payment, of $2,915.61. Subtracting the $1,400 Ms. McGhee paid, disregarding the unauthorized late fees and the $77.44 unsecured repair bill, the balance on the Ford is $1,515.16. That amount could be paid through Ms. McGhee's plan, if the car were still property of her bankruptcy estate.

### 3. Ms. Misty Gordon's Testimony

Misty Gordon is Mr. Pritchett's secretary. She testified that a person who identified himself as Mr. Claudie Thompson called Mr. Pritchett's office concerning the Ford. She said that Mr. Thompson told her that he had purchased the car from Ms. McGhee; that Ms. McGhee had told him nothing was owed on her debt to Mr. Pritchett; and that he had discovered paper work in the car describing the sale to Ms. McGhee by Mr. Pritchett.

Ms. Gordon testified that Mr. Thompson wanted to know whether Ms. McGhee had paid for the car, and if not, how much remained. She told him that a debt remained and gave him the amount.

14

According to Ms. Gordon, Mr. Thompson later drove the Ford to Mr. Pritchett's lot.  Mr. Pritchett was there when Mr. Thompson arrived.  Mr. Thompson gave Mr. Pritchett the temporary license plate and they had a conversation, in her presence, about how Mr. Thompson purchased the car from Ms. McGhee and later discovered that Mr. Pritchett had a lien on the vehicle.  She said that Mr. Thompson told Mr. Pritchett, "he didn't want to have any problem about the car, so that is why he brought it back to you."  Transcript, page 64.

## III.  Applicable Law

Section 362(h) of the Bankruptcy Code provides, "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  11 U.S.C. § 362(h).  Under that section, for an award of damages to be made to an individual debtor for a stay violation, the debtor must prove that he or she was injured by the stay violation and that the defendant's violation of the stay was willful.  A violation of the automatic stay is a "willful violation" if, "the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay."  Jove Eng'g, Inc. v. Internal Revenue Serv., 92 F.3d 1539, 1555 (11th Cir. 1996).

In addition, section 362(h) authorizes an award of punitive damages for stay violations only in "appropriate circumstances."  "Appropriate circumstances" has been interpreted to require that the violator's acts be egregious, vindictive, malicious, or accompanied by bad faith.  "[E]gregious, intentional misconduct on the violator's part is necessary to support a punitive damages award."  United States v. Ketelson (In re Ketelson), 880 F.2d 990, 993 (8th Cir. 1989).  "An additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(h)."  Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.), 902 F.2d 1098, 1105 (2nd Cir. 1990).  "[O]nly egregious or vindictive misconduct warrants punitive damages for willful violations of the automatic stay of 11 U.S.C. § 362."  Davis v. Internal Revenue Serv., 136 B.R. 414, 424 (E.D. Va. 1992).

## IV.  Findings and Conclusions of Law

### A.  The Nissan - A. P. No. 05-40191

#### 1.  Mr. Pritchett Intentionally Violated the Stay in Regard to the Nissan

Ms. Boling testified that on June 10, 2005, she spoke with Mr. Pritchett and told him about Ms. McGhee's bankruptcy case.  She also testified that she had a second conversation with Mr. Pritchett after Ms. McGhee's Nissan had been repossessed.  The

15

Court accepts Ms. Boling's testimony without question.  Ms. Boling is unbiased.  There is no reason why she would not be truthful about the events she describes.

Mr. Pritchett denied having a conversation with Ms. Boling prior to repossessing the Nissan.  His testimony on the subject is however conflicting.  Therefore, the Court must question the accuracy of his testimony.

On direct-examination, Mr. Pritchett first testified that the Nissan was repossessed on June 8.  On cross-examination, he denied having said that the repossession occurred on a specific date.  He also testified that he does not recall when the repossession occurred.

Mr. Pritchett also testified that after the bankruptcy case was filed, Ms. McGhee told him that she had not filed a bankruptcy case.  He said that, when Ms. Boling called him after the Nissan had been repossessed, Ms. Boling told him that Ms. McGhee was not in bankruptcy.

Mr. Pritchett also testified that he was not in the practice of imposing late fees on Ms. McGhee, even though the ledgers attached to the proofs of claim he filed in this case clearly indicate that he added a substantial number of late fees in significant amounts to her accounts.  In addition, Mr. Pritchett denied that he had filed any proofs of claims in Ms. McGhee's case.  The Court's records demonstrate that he did.

And finally, Mr. Pritchett stated that his contract with Ms. McGhee required her to maintain insurance on the Nissan.  He did not produce any document that contained any such requirement.

Ms. McGhee testified that before the Nissan was repossessed, during a telephone conversation, she told Misty Gordon that she was in bankruptcy.  While Ms. McGhee may not be completely unbiased, her testimony is more plausible than Mr. Pritchett's.  Moreover, Ms. Gordon was at the trial.  Mr. Pritchett could have called her as a witness to give her account of the conversation if that account would have been different.  He did not.  That suggests the conversation occurred.

Based on the unbiased testimony of Ms. Boling, and, to a lesser degree, Ms. McGhee's testimony, the Court concludes that it is more probable than not that the Nissan was repossessed after June 9, 2005, and that Mr. Pritchett had been verbally informed by Ms. Boling that Ms. McGhee was in bankruptcy before the Nissan was repossessed.  Consequently, Mr. Pritchett's repossession of the Nissan violated the automatic stay in Ms. McGhee's bankruptcy case.  And because he knew about the bankruptcy case, and therefore knew about the stay, in addition to being willful, the violation was intentional.  Moreover, since the repossession violated the stay, Mr. Pritchett's continued retention of the Nissan until September 10, 2005, despite requests that the Nissan be returned, constitutes an additional intentional stay violation.

## 2.  Damages

Because Mr. Pritchett's stay violations were intentional, and not merely willful, Ms. McGhee may be awarded both compensatory and punitive damages, to the extent either or both are supported and justified by the evidence.

### a.  Compensatory Damages

### (1) Mechanical Problems

An award of compensatory damages is problematic in light of Ms. McGhee's testimony.  Ms. McGhee did not present any evidence that the mechanical difficulty which manifested itself several days after she recovered the car from Mr. Pritchett was in anyway caused by or orchestrated by Mr. Pritchett.  Furthermore, she testified that her father is a self-employed mechanic.  It seems reasonable that it would have been relatively easy for her to have had him examine the car and testify about the nature of the problem and to offer his opinion about what may have caused the damage.  But she did not.  And this Court cannot assume that Mr. Pritchett caused the problem while the vehicle was in Mr. Pritchett's possession.  Consequently, Ms. McGhee is not entitled to compensatory damages for any loss of wages or inconvenience which she may have experienced because of the mechanical difficulties she reports she had with the Nissan.

### (2) Transportation

In another light, Ms. McGhee testified that after the Nissan was repossessed, she lost her means of transportation.  She testified that with that loss she was not able to get to work or to drive her children to the places they needed to go.  She concluded that the loss of the Nissan and her ability to get around caused her to lose wages from work and ultimately to lose her job.

This part of Ms. McGhee's contentions and testimony also gives the Court difficulty in calculating Ms. McGhee's damages.  Ms. McGhee had another option.  In her testimony about transportation, Ms. McGhee does not mention that she owned the Ford, which was, according to other evidence, operational and in good condition.  Certainly Ms. McGhee could have used the Ford for transportation instead of sending it to her brother's during the time Mr. Pritchett had possession of the Nissan.  The Court cannot therefore, find that Ms. McGhee suffered compensatory damages in the form of lost wages, lost job, and inconvenience as a result of her temporary loss of the Nissan.  She could have avoided any such damages and inconvenience simply by driving the Ford.[4]

_____

[4] "Where one person has committed a tort, breach of contract, or other legal wrong against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages.  The person wronged cannot recover for any

17

### (3) Other Compensatory Damages

This Court does not suggest that Ms. McGhee is not entitled to some compensatory damages for the repossession and retention of the Nissan by Mr. Pritchett. The vehicle does, after all, belong to her. She is entitled, within reason, to use it in any manner that she deems fits. She was deprived of that right, and no doubt suffered some degree of inconvenience as a result. That could not have been alleviated, even if she had not sent the Ford to her brother's. She is entitled to be compensated in some respect for that deprivation, or more appropriately, the loss of use of the vehicle. Such compensation will however be difficult to quantify and will not be as much if she had not had the option of driving the Ford.

Therefore, based on the above, the Court finds, for Ms. McGhee's loss of the use of the Nissan during the time that it was in Mr. Pritchett's possession, as well as the time, trouble, and inconvenience that she had to expend and go through to get it back, Ms. McGhee will be awarded compensatory damages in the amount of $550. That amount is more than half of Ms. McGhee's claimed loss of wages.

### b. Punitive Damages

### (1) Applicability

As indicated before, Mr. Pritchett intentionally violated the stay. He repossessed the Nissan despite having received verbal notification from Ms. Boling of Ms. McGhee's bankruptcy. And he retained the Nissan until he returned it on September 10, 2005.

On the other hand, and based on the facts and applicable case law, the Court must conclude that Mr. Pritchett's actions cannot otherwise be characterized as hostile,

---

item of damage which could thus have been avoided." Charles T. McCormick, Handbook on the Law of Damages, page 127 (West Publishing Co. 1935). That venerable rule of law has generally been applied by bankruptcy courts to damages, including costs and attorneys fees, in actions brought pursuant to section 362(h). See Rosengreen v. GMAC Mortgage Corp., 2001 WL 1149478 (D. Minn., Aug. 7, 2001); Eskanos & Adler, P.C. v. Roman (In re Roman), 283 B.R. 1 (9th Cir. BAP 2002); In re Oksentowicz, 324 B.R. 628 (Bankr. E.D. Mich. 2005); In re Risner, 317 B.R. 830 (Bankr. D. Idaho 2004); Westman v. Andersohn (In re Westman), 300 B.R. 338 (Bankr. D. Minn. 2003); In re Genesys, Inc., 273 B.R. 290 (Bankr. D.C. 2001); In re Sammon, 253 B.R. 672 (Bankr. D.S.C. 2000); In re Flack, 239 B.R. 155, (Bankr. S.D. Ohio 1999); Clayton v. King (In re Clayton), 235 B.R. 801 (Bankr. M.D.N.C. 1998); In re Robinson, 228 B.R. 75 (Bankr. E.D.N.Y. 1998); In re Belcher, 189 B.R. 16 (Bankr. S.D. Fla. 1995); In re Price, 179 B.R. 70 (Bankr. S.D. Ohio 1995); In re Esposito, 154 B.R. 1011 (Bankr. N.D. Ga. 1993); Sizemore v. Dayton Emergency Specialists (In re Sizemore), 138 B.R. 540 (Bankr. S.D. Ohio 1992); In re Newell, 117 B.R. 323 (Bankr. S.D. Ohio 1990); McLaughlin v. Fireman's Trust Mortgage Corp. (In re McLaughlin), 96 B.R. 554 (Bankr. E.D. Pa. 1989).

or egregious, or vindictive, or malicious, or abusive, or belligerent.  That conclusion is supported by the totality of the evidence.  That evidence includes:

1. The closeness of the question of whether he received verbal notice of the case before the car was repossessed;

2. There was no breach of the peace;

3. No one was accosted, or threatened, or injured, or insulted either during the conduct of the actual repossession or afterwards;[5]

4. In regard to the post-repossession retention, Mr. Pritchett had no reason to believe that Ms. McGhee was without transportation, since, to his knowledge, she still had the Ford, and he had no way of knowing that she would send it away rather than drive it in lieu of the Nissan;

5. Because he was a layman, Mr. Pritchett might have assumed that part of the reason for the adversary proceeding was for the Court to determine whether or not he must return the car.  Additionally, he might have believed that the prudent course of action would be to wait for an order from the Court; and

6. Moreover, it is apparent that Mr. Pritchett earnestly believes that Ms. McGhee is required by contract to maintain insurance on the car, and that he was legitimately concerned, as he should be, about returning the car without receiving some assurance that she obtain and maintain insurance.

### (2)  The Sanctity of the Automatic Stay

Individual creditors cannot decide whether, or when, to observe the automatic stay.  There must therefore be consequences for those who intentionally disregard it, otherwise, they may presume they are free to repeat their actions, events that would of course lead to an erosion of the very protection that the stay was intended to provide.  An award of some amount of exemplary damages is, therefore, warranted.

### (3)  Calculation

In fashioning a punitive damage award, the Court is guided by the principal, "The Due Process Clause of the [Fifth] Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a defendant and creates substantive limits on the amount of punitive damages a [bankruptcy court] may impose."  Kemp v. American

---

[5] As discussed above, Ms. McGhee contends that Mr. Pritchett insulted her brother during a telephone call she monitored.

Telephone & Telegraph Co., 393 F.3d 1354, 1362 (11th Cir. 2004) (parentheticals added).[6]  To avoid the imposition of an award that is constitutionally excessive, this Court must consider three guideposts.  Those are: "(1) the degree of reprehensibility of the defendant's conduct;  (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award;  and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  Id.

### (a)  Reprehensibility

Writing for the Court of Appeals for the Eleventh Circuit in Kemp, Circuit Judge Rosemary Barkett explained, "The reprehensibility of a defendant's conduct is '[p]erhaps the most important indicium of the reasonableness of a punitive damages award.' "  Id. at 1363 (quoting BMW of N. Am., Inc., v. Gore, 517 U.S. 559, 575 (196)).  Circuit Judge Barkett goes on to explain that in assessing the reprehensibility of a defendant's conduct, several factors must be considered.  Those include:

> (1) whether the injury caused physical harm;  (2) whether the tortious conduct demonstrated an indifference to, or a reckless disregard of, the health or safety of others;  (3) whether the target was financially vulnerable;  (4) whether the conduct involved repeated actions;  and (5) whether the harm was the result of intentional malice, trickery, or deceit.

Id.

In regard to the "reprehensibility," of Mr. Pritchett's actions, the Court finds that his conduct in repossessing and retaining the Nissan post-petition, was not overly reprehensible.  It caused no physical harm.  It did not demonstrate an indifference to, or a reckless disregard of, the health or safety of others.  It did not involve repeated actions.  It did not involve malice, trickery or deceit.

On the other hand, Ms. McGhee was financially vulnerable.  Mr. Pritchett's conduct was intentional and ostensibly involved an indifference to Ms. McGhee's right to maintain possession of the Nissan through imposition of section 362(a) of the Bankruptcy Code.  And Mr. Pritchett's retention of the Nissan for the three month period following its repossession was at least continuous, if not repetitive.

### (b)  Disparity

In regard to the second punitive damages guidepost, that is the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, Judge Barkett explains, " 'few awards exceeding a single-digit ratio between

---

[6] This quote was written originally in terms of the Fourteenth Amendment because the issue of punitive damages was being discussed in regards to a state action.

Case 05-40191-BGC    Doc 16    Filed 03/01/06    Entered 03/01/06 10:40:10    Desc Main
Document      Page 20 of 28

punitive and compensatory damages, to a significant degree, will satisfy due process.' " Id. (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003)). But she adds, "as the Supreme Court has explained, in some situations a higher ratio may be appropriate where a 'particularly egregious act has resulted in only a small amount of economic damages.' " Id. (quoting Campbell, 538 U.S. at 425).

In this case, Mr. Pritchett's conduct was not "particularly egregious." Consequently, the punitive damages award in this case should not exceed the compensatory damages awarded by greater than a single-digit ratio.

### (c)  Comparison

The final guidepost, which involves a comparison between the punitive damages to be awarded and civil penalties authorized or imposed in comparable cases, is, according to Judge Barkett, "accorded less weight in the reasonableness analysis than the first two guideposts...." Id. at 1364.  Indeed, there is no statutory provision for awarding civil penalties for stay violations, and the Court is unable to think of any cases in which civil penalties are authorized or imposed which are analogous to cases involving violations of section 362(a).

### (4)  Conclusion to Punitive Damages

Applying the above-described guideposts, the Court concludes that a punitive damages award of $1,500 will serve adequately to punish Mr. Pritchett and to make him consider the stay in future cases.  That amount is about three times the compensatory damages awarded and well within the Supreme Court's single-digit multiplier parameters.  Because Mr. Pritchett's conduct was not overly reprehensible, a greater award is unwarranted.

### c.  Attorneys Fees

Section 362(h) allows for reimbursement for attorneys fees rendered necessary by a creditor's stay violation.  That is one element of "actual damages" that may be awarded to a debtor who was injured by such a violation.  Attorneys fees damages here, like the other damages discussed above, are difficult to calculate.

Ms. McGhee did not testify that: (1) she paid any fees to her attorney for the work that he performed in connection with this adversary proceeding; (2) she owes any fees for that work; or (3) she is seeking reimbursement of any fees from Mr. Pritchett.

No evidence was submitted to suggest that Ms. McGhee has paid or incurred any obligation to pay fees to her attorney for the work he performed in connection with this adversary proceeding.  Furthermore, Ms. McGhee's attorney did not file a fee application.  He did not suggest to the Court that: (1) Ms. McGhee has paid him for the work he performed in connection with this adversary proceeding; (2) she owes him any

21

fees for that work; or (3) Ms. McGhee is seeking reimbursement of any such fees from Mr. Pritchett.  In short, the record is void of any evidence that Ms. McGhee suffered "actual damages" in the form of attorneys fees as a result of Mr. Pritchett's stay violation.  Consequently, an award of attorneys fees in this case pursuant to section 362(h) is unwarranted.

### d.  Conclusion on Damages Caused by Repossession of the Nissan

In summary, the Court will award Ms. McGhee $550 compensatory damages and $1,500.00 punitive damages, for a total of $2,050.

### 3.  Recoupment

Mr. Pritchett is entitled to recoupment of the money Ms. McGhee owes him. "Recoupment allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim."  Holford v. Powers (In re Holford), 896 F.2d 176, 177 (5th Cir. 1990) quoting Collier on Bankruptcy para. 553.03 (15th ed. 1984).

A claim for damages against a creditor under section 362(h) has been held to have arisen out of the "same transaction" embodied in that creditor's proof of claim. See State v. Burke (In re Burke), 146 F.3d 1313, 1318 n.10 (11th Cir. 1998), cert. denied, 527 U.S. 1043 (1999).  Likewise, under Alabama law, a claim for conversion based on wrongful repossession has been held to have arisen from the "same transaction" as the sales contract for the property repossessed.  Scroggins v. Alabama Gas Corp., 275 Ala. 650, 655, 158 So.2d 90, 95 (1963).  As stated by the Supreme Court of Alabama:

> It is apparent that appellee's claim rests on the contract between the parties for the purchase of the stove, appellee contending that the plaintiff has breached that contract by nonpayment.  Appellant's claim is based in the main on acts committed during defendant's repossession of the stove--trespass, conversion, breach of contract, and money had and received.  It can be fairly said, however, that both claims arise out of the same transaction.  That transaction is the purchase of a stove and all of the ramifications of that purchase.

> The purpose for requiring that a plea of recoupment rest upon the same transaction or contract as the plaintiff's cause of action is to prevent a multiplicity of unrelated issues of fact and law. Certainly, in this case, to allow defendant's claim of breach of contract, which is so vitally connected with plaintiff's cause of action, would be in keeping with that purpose

Case 05-40191-BGC    Doc 16    Filed 03/01/06    Entered 03/01/06 10:40:10    Desc Main
Document      Page 22 of 28

Id.  See also Nabring v. Bank of Mobile, 58 Ala. 204, 212, 1877 WL 1295 (1877) (pledgee may recoup debt of defendant pledgor to him when sued by the pledgor for conversion of the items pledged); Di Charo v. Spirito, 150 A.2d 637, (R.I. 1959) (defendant vendor entitled to recoup fair rental value for time plaintiff purchasers were in premises without title in reduction of damages awarded against vendor for failure to convey title to premises to purchasers by warranty deed).[7]

Mr. Pritchett testified that the correct amount of his claim on the Nissan was $2,043.05.  He is entitled to recoup that amount from the damages awarded herein to Ms. McGhee.  By virtue of that recoupment, Mr. Pritchett's claim with respect to the Nissan will be satisfied in full.  Consequently, no distributions shall be made by the trustee to Mr. Pritchett in connection with this case.  Furthermore, the lien on the Nissan which secured that claim is, by virtue of section 506(d) of the Bankruptcy Code, 11 U.S.C. § 506(d), void and no longer of any legal force or effect.

Ms. McGhee now owns the Nissan free and clear of any interest of Mr. Pritchett. A separate order will be entered that requires Mr. Pritchett to pay the remaining damages he owes to Ms. McGhee to the Chapter 13 trustee.  That amount is  $6.95, and under section 1306(a)(1) and (2) of the Bankruptcy Code, 11 U.S.C. § 1306(a)(1) and (2), is property of the bankruptcy estate.  See Price v. United States, 42 F.3d 1068, 1072 (7th Cir. 1994).

### B.  The Ford - A. P. No. 05-40228

### 1.  Mr. Pritchett Did Not Violate the Stay in Regard to the Ford

Mr. Pritchett testified: (1) Mr. Thompson told him that he had purchased the Ford from Ms. McGhee; (2) Mr. Pritchett produced a temporary license plate issued to Mr. Thompson as proof that Mr. Thompson purchased the Ford from Ms. McGhee; and (3) Mr. Thompson voluntarily relinquished the car and delivered it to Mr. Pritchett.  That testimony is supported by Ms. Gordon's testimony, which was: (1) Mr. Thompson told her he had purchased the Ford from Ms. McGhee; (2) she saw Mr. Thompson drive the car onto the lot and release it to Mr. Pritchett; (3) she heard Mr. Thompson tell Mr.

---

[7] There may be some question as to the relationship of section 553 of the Bankruptcy Code and recoupment.  While section 553(a) specifically limits the setoff rights of creditors, no section of the bankruptcy code purports to impede a creditor's common law right to recoupment.  "Setoff" is the right of a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff which arose out of a transaction which is different from that on which the plaintiff's claim is based.  Holford v. Powers (In re Holford), 896 F.2d 176, 178 (5th Cir. 1990).  Section 553(a) permits only the setoff of a prepetition obligation against another prepetition obligation and thereby prevents a creditor from setting off a prepetition obligation owed by the debtor against a post-petition obligation owed by the creditor to the debtor. Section 553, however, has no application to recoupment.  See Holford v. Powers (In re Holford), 896 F.2d at 179; 9D Am. Jur. 2d Bankruptcy § 2558, n. 71.

23

Pritchett that he had purchased the car from Ms. McGhee; and (4) she saw Mr. Thompson deliver the temporary license plate to Mr. Pritchett.

The testimony of these two witnesses outweighs Ms. McGhee's testimony. Ms. McGhee simply denied that she sold the car to her brother. She testified that the story her brother told her about the Ford was different from the ones Mr. Pritchett and Ms. Gordon told this Court. But she did not call her brother as a witness to verify her version of the events or to rebut the testimony from Mr. Pritchett and Ms. Gordon. And Ms. McGhee eventually stated that she did not know who was telling the correct story.[8]

But regardless of any other evidence, the issuance of the temporary license to Mr. Thompson resolves all of the issues involving the Ford. As stated above, a photocopy of that temporary license was admitted into evidence as Defendant's Exhibit 1. The document is entitled "Alabama Twenty Day Temporary Tag." It reflects that it was issued for the Ford automobile involved in this proceeding to Claudie Thompson, Jr., by William Oswalt, Judge of Probate of Fayette County, Alabama. The temporary plate bears the license plate number A667802 and has an expiration date of August 16, 2005.

Section 32-6-213 of the Alabama Code authorizes a probate judge, in limited circumstances, to issue a temporary license plate only to the <u>owner</u> of a motor vehicle. That section reads:

> Each judge of probate of this state or other county official in this state authorized and required by law to issue motor vehicle license tags shall have the authority, upon proper request, to issue a temporary license tag and a temporary registration certificate to the <u>owner</u> of a motor vehicle to be licensed in this state when, due to circumstances, a permanent license tag cannot immediately be issued or when, in the judgment of the probate judge or other county official authorized and required by law to issue motor vehicle license tags, just cause exists for the issuance of such temporary license tag and registration certificate.

Code of Ala., 1975, § 32-6-213 (emphasis added).

Likewise, the Alabama Department of Revenue's definition of "just cause," for purposes of section 32-6-213, does not contemplate the issuance of a temporary license plate to anyone other than a car's owner. That definition reads:

> (4) Under the provisions of Code of Ala. 1975, § 32-6-213, Judges of Probate are authorized "to issue a temporary license tag and a temporary

---

[8] In referring to Mr. Pritchett's testimony about the Ford, Ms. McGhee testified, "I can't say if his part of the story is true or if my brother's side of the story is true." Transcript at 59.

registration certificate to the owner of a motor vehicle to be licensed in this state when, due to circumstances, a permanent license tag cannot immediately be issued or when, in the judgment of the Probate Judge ... just cause exists for the issuance of such temporary license tag and registration certificate."  With regard to this section, "just cause" has been determined by the Commissioner of Revenue to exist in, but not to be limited to, the following instances:

> (a) when the purchaser of a motor vehicle does not receive from the selling individual, dealer, or firm the certificate of title or other documents necessary for application for title or for proof of ownership;

> (b) when the seller of a motor vehicle delays in furnishing the buyer with an application for title.

(5) "Just cause" according to § 32-6-213 does not exist when, in the judgment of the Judge of Probate, the applicant for temporary registration is resorting to that measure in an effort to avoid remission of regular registration fees, casual sales tax, or ad valorem tax in full.

20A Ala. Admin. Code 810-5-1-.228.

Both the applicable statute and the quoted section of the Alabama Administrative Code permit a temporary license plate to be issued only to the owner of a motor vehicle and specifically contemplate the issuance of temporary license plate in connection with the sale of an automobile.  Those provisions do not authorize the issuance of a temporary license plate to a non-owner merely for the purpose of transporting a vehicle with an expired tag from one county or the other in lieu of the owner's obtaining updated "stickers" for a permanent license plate.

The above conclusion is buttressed by Code of Ala., 1975, § 32-8-32, which permits the issuance of a license plate only to the owner of a motor vehicle, and only upon presentation by the vehicle's owner of a the copy of an application for a certificate of title, a certificate of title, a duplicate certificate of title, or a copy of an application for a replacement certificate of title.  That section reads:

> No motor vehicle license (or license plate) may be issued and no motor vehicle license (or license plate) may be transferred for use on a motor vehicle required to be titled under this chapter except on presentation by the owner to the judge of probate or other issuing officer, the copy of an application for a certificate of title to such vehicle, a certificate of title to such vehicle, a duplicate certificate of title to such vehicle where the original is held by a lienholder, or a copy of the application for a replacement certificate of title;  provided however, when the owner of a

25

motor vehicle has complied with the provisions of this section in licensing
a motor vehicle transferred to him this section shall not apply thereafter to
the renewal of such license by such owner of such motor vehicle.

Code of Ala., 1975, § 32-8-32 (emphasis added).

Consequently, Mr. Thompson could not have obtained a temporary license plate
for the Ford unless he had in fact satisfied the probate judge of Fayette County that he
was its owner, ostensibly by some written indicia of ownership executed by Ms.
McGhee, such as a bill of sale.  And he could not have become the vehicle's owner
except by transfer from Ms. McGhee.  The only conclusion this Court may reach is that
despite Ms. McGhee's protests to the contrary, she transferred ownership of the Ford to
Mr. Thompson.

### 2.  The Ford is Not Property of this Estate

Because of the transfer, the Ford was no longer property of the estate or
property of the debtor.  Because the Ford is not property of the estate or property of the
debtor, Mr. Pritchett was not stayed from taking possession of it by any provision of
section 362(a).  Similarly, section 362(a) did not preclude him from retaining the Ford
despite demands for its return.  And since the Ford is neither property of the estate nor
property of the debtor, and has been voluntarily relinquished by its true owner to Mr.
Pritchett, Ms. McGhee is not entitled to its return, has no right to possess it, and has no
right to exercise ownership over it.  Those prohibitions include any right to obtain the
vehicle through the pending adversary proceeding or by paying the balance of the
purchase price owed on the vehicle through the pending Chapter 13 plan.

### 3.  Credit Against the Claim for the Ford

On the other hand, Ms. McGhee is entitled to credit against Mr. Pritchett's claim
for the Ford.  In the proof of claim relating to the debt owed on the Ford, Mr. Pritchett
represented that the value of the Ford, as of July 21, 2005, the date he executed that
proof of claim, was $2,093.05.  Again, disregarding the improper late fees added to Ms.
McGhee's account, the evidence, (which includes the ledger attached to Mr. Pritchett's
proof of claim), reflects that Ms. McGhee owed $1,515.16 on the Ford when she filed
her bankruptcy case.  In addition, she owed an unsecured repair bill of $77.44.  The
correct amount of Mr. Pritchett's claim with respect to the Ford, including both secured
and unsecured components, is therefore $1,592.60.  Consequently, Ms. McGhee's debt
on the Ford is completely satisfied and Mr. Pritchett's claim must be disallowed.

## V.  Summary and Conclusions

### A.  The Nissan

Mr. Pritchett violated the automatic in regard to the Nissan.

Ms. McGhee is entitled to damages from Mr. Pritchett for $2,050.  That amount includes actual damages of $550 and punitive damages of $1,500.  Those damages are awarded because of Mr. Pritchett's violation of the automatic stay with respect to the 1996 Nissan 200SX subject of Adversary Proceeding No. 05-40191.

The damages of $2,050 shall be reduced by $2,043.05, which is the amount remaining on Ms. McGhee's debt to Mr. Pritchett secured by the 1996 Nissan 200SX.

The total amount of damages now due from Mr. Pritchett for his violation of the automatic stay with respect to the 1996 Nissan 200SX is $6.95.  He should pay that amount to the Chapter 13 trustee.

The claim Mr. Pritchett filed with respect to the debt owed on the 1996 Nissan 200SX has been satisfied in full by virtue of the recoupment of the sums owed on that claim.

Because that claim is satisfied, Ms. McGhee now owns the 1996 Nissan 200SX free and clear of any security interest, lien or other interest of Mr. Pritchett.

Mr. Pritchett will be directed to transfer title of the 1996 Nissan 200SX to Ms. McGhee.

### B.  The Ford

Mr. Pritchett did not violate the automatic stay in regard to the Ford.

Ms. McGhee is entitled to have the value of the 1996 Ford Crown Victoria which is the subject of Adversary Proceeding No. 05-40228, applied toward the satisfaction of the claim filed by Mr. Pritchett with respect to that vehicle.

The claim filed by Mr. Pritchett with respect to the debt owed on the 1996 Ford Crown Victoria has been satisfied in full by virtue of the application of the value of the vehicle toward the payment of that debt.

### C.  Mr. Pritchett's Claims

By virtue of the satisfaction of his claims, Mr. Pritchett is not entitled to any more money from Ms. McGhee and consequently shall not receive any payments from the Chapter 13 trustee in Bankruptcy Case No. 05-41992-BGC-13.

27

Separate orders will be entered in each adversary proceeding in conformity with this memorandum opinion.

Dated: March 1, 2006                    /s/Benjamin Cohen
                                        BENJAMIN COHEN
                                        United States Bankruptcy Judge


BGC:sm

cc:     James Pritchett
        Frank LaBudde, attorney for the debtor
        Linda Gore, Chapter 13 trustee